## Barclay's Estate

*Samuel H. High*, for accountant.

*James Herbert Egan* and *Edgar C. Van Dyke*, for claimant and exceptant.

HOLLAND, P. J., February 21, 1934.—Hugh Balfour Barclay died on April 9, 1931, intestate, and letters of administration on his estate were granted to the accountant, his surviving wife, on April 16, 1931.

Fred W. Barclay presented claim upon a book account for goods and services from March 26, 1929, to April 9, 1931, the date of the death of the decedent, in the sum of $1,037.01, and a claim upon a book account for goods and services from April 11, 1931, to July 1, 1931, in the sum of $121.03, which latter claim was for goods and services furnished to the administratrix subsequent to the decedent's death; or a total claim of $1,158.04.

The claimant offered his original books of entry in evidence, which were admitted, the claimant having proven that he kept the books. This admission of the books of original entry in evidence was objected to by the estate. The objection of the estate was based, of course, upon the well-known prohibitory

Act of May 23, 1887, P. L. 158, excluding the claimant himself as a witness to prove his claim against a decedent's estate. It introduces the age-old controversy whether in such case the testimony of the witness is to a fact which occurred in the lifetime of the decedent, or whether it is a present fact. Unfortunately, we have no clear and binding authority from our courts of last resort to guide us conclusively in answering this question as applied to the books of original entry. A brief glance, however, at the status of the party claiming, where he is claiming against a living person, might be enlightening.

Prior to the Act of April 15, 1869, P. L. 30, making parties competent witnesses where no testimony of third persons was available, the books of original entries were the evidence of the transactions, the oath of the party being received merely to prove the books. If the entries were made by a clerk, however, his oath was the primary evidence, and the account was used to refresh his memory. Since the passage of this act, the party stands in the same position the clerk stood prior thereto, and his testimony, when it can be produced and if he has personal knowledge of the transactions, is the primary evidence, the entries being used to corroborate him or to refresh his memory, unless he is unable to recall the transaction, in which case the entries become the best evidence of it. Entries not admissible as such are competent for the purpose of refreshing the memory of the witness. This is the case where, as above indicated, the claimant is claiming against a living party. Where he is claiming against a deceased party, or rather the estate of a deceased party, he is to some extent placed, insofar as his competency is concerned, somewhat in the position of the claimant against the living party prior to the Act of 1869, supra; that is, at most, he is only competent to prove upon oath the books themselves, and the books of original entries are the evidence of the transaction.

However, the determining factor as to whether the witness who is the claimant can prove his own books is whether it is the proof of a present or prior fact. The principles which have been laid down as the determining ones in this question are clear, but their application is not so clear, and we have no definite decision thereon to guide us as applied to book entries. All persons may freely testify to existing facts or conditions or matters occurring since the death of the other party to the transaction, even though such testimony tends to prove inferentially facts or conditions which existed prior thereto. But if the testimony necessarily relates to or tends to establish facts which existed or occurred in the decedent's lifetime, it is incompetent.

The nearest guidance we can find relative to this question of present fact as against past fact are a few decisions on the subject of forgery. Can a claimant against a decedent, or one seeking to avoid a liability to a decedent's estate, where in either case the claim is based upon a written instrument with the surviving party's signature on it, say as a present fact that his signature is a forgery or would his so saying in effect be his testifying to the past fact that he did not sign the instrument? In Sutherland v. Ross, 140 Pa. 379, it was held that a grantor in a deed was not competent, after the death of the grantee, to testify that his signature was forged, and the acknowledgment untrue; non constat that he could not say upon a question of the signature that it was not his handwriting and therefore not his signature; thereby testifying to a then present fact. This seems to be what the appellate court intended to imply, because in Toomey's Estate, 150 Pa. 535, it was held that an opinion as to handwriting, being based on an admission of a paper shown the witness at the time, was an expression of a fact existing after the death of the party and therefore competent. In Ilyus v. Buch, 34 Pa. Superior Ct. 43, where the

executor of the deceased party to a bond had entered judgment on the bond against the surviving party, and the surviving party had petitioned to open the judgment, it was held that the defendant could not testify that her signature to the bond was void; that the bond was not in court, which was one of the reasons for dismissing the petition. It is obvious that this case was properly decided from this angle, as it was clearly testimony by the interested defendant to the past fact of her signature having been void and not testimony in any sense as to the condition of the instrument which was in court and under inspection, which would be a present fact as to anything concerning it. It does not decide that, had the instrument been in court, the defendant could not have looked at the signature and said that it was not her handwriting.

Obviously the line in applying the determining rule of whether it is a present or past fact being testified to often becomes very uncertain, and as was hinted in Ilyus v. Buch, supra, a certain latitude or discretion should be allowed the trial judge, taking into consideration all the circumstances, parties, their credibility, and the weight of associated evidence. All that was permitted by the court, in the introduction of the books of original entry of this claimant, Fred W. Barclay, was to permit him to say under oath that the books he offered in evidence on the day of the hearing were his books of original entry. He was not permitted to go any further, and the books stood alone as the competent evidence for what they were worth. In admitting these books of original entry in evidence and permitting them to be proven as such as a present fact on the day of the hearing by the claimant himself, we are of the opinion that we committed no error.

Whether or not the books of original entries of the claimant had been admitted in evidence or not is of little importance, inasmuch as our disposition of the claim will be on other grounds, and it would seem, therefore, that our discussion above is superfluous, for that reason. However, the admission of the books in evidence was so stoutly opposed by the estate both at the hearing and in the arguments and briefs of the estate that we regard it as of some importance to state the reasons for our position in ruling upon this matter of evidence.

Even admitting the books as evidence and establishing that they showed that between the dates indicated therein, March 26, 1929, to April 9, 1931, there was a balance due of $1,158.04 to the claimant as claimed by him, it would be necessary for claimant to establish that the indebtedness admitted to be due from the claimant to the decedent as of January 1, 1929, had been canceled.

To prove this, claimant relied practically entirely upon the testimony of one Richard D. Kistler, through which it was sought to establish that decedent had shown an intention to cancel all the indebtedness due him by the claimant as of January 1, 1929. This witness was in the employ of the decedent from March 1927 until August 1928, as manager. The testimony does not, however, disclose anything but extremely indefinite expressions of the decedent showing appreciation of the claimant as to his talents, as to his value to the decedent in the conduct of his business, and as to the claimant's technical knowledge in regard to propagating plants and shrubbery. There was testimony as to some loose expressions of the decedent of his intention to do something for the claimant, as for example, that "he felt he could never quite repay Fred for the things he had done", and "they would go along in the way they had before and he would take care of Fred. He would pay him as time went along." Then, again, "he could never repay Fred for the things Fred had done for him and that he had not properly remunerated him for the services Fred had rendered, particularly during his absence in Europe." The decedent further said that, "Perhaps

he should take a certain amount of money, whether it be two or three or five thousand dollars, and give it to Fred in order to handle the propagating end of it." From all the statements that were testified to by this witness that decedent had said, the most that can be determined is that decedent entertained an indefinite intention of compensating the claimant, his brother, fully, for whatever his brother did for the decedent in the way of service, and in the way of lending his talents to decedent's business, which talents were represented as extraordinary in the horticultural line. We seek in vain, however, for any definite statement of an intention to release, absolutely and unequivocally, the claimant from the amount claimant owed decedent as of January 1, 1929. The claimant therefore wholly fails to meet that degree of proof necessary to show that the balance against him as of January 1, 1929, was canceled by decedent, and, as heretofore indicated above, inasmuch as that balance was greater admittedly than the amount now claimed by the claimant against the decedent, it is a full set-off of the decedent's estate against the claim of the claimant, even admitting that his claim was fully proven as to amount, and we cannot find otherwise than that at the time of decedent's death, and even counting the balance claimed by the claimant incurred since decedent's death, through his dealings with the administratrix, the balance was not in favor of the claimant. The claim of Fred W. Barclay, therefore, having failed in proof, is dismissed.

The only remaining question to determine is the amount of dividend due the claimants whose claims are admitted. The inventory and appraisement was made by Freeman & Company, the integrity and genuineness of whose appraisements cannot be questioned. The appraisement of this appraiser of the personal estate was amply corroborated as to its correctness by numerous nurserymen, such as Humphreys and Wohlert, who themselves were interested as creditors, and who agree that the appraisement of the said appraisers was full and fair. The widow, who is also the administratrix, saw fit to take the personal property over at the appraised value as though she had bought it and continued the business. We are convinced that by her doing so the creditors fared as well, if not better, than if the whole personal property had been sold at a forced sale with the usual inevitable concomitant of sacrifice in price. But, on the other hand, as this was her choice she must stand by her bargain of having bought all the personal assets at the inventory price, and the dividend of the creditors must be based upon the relation of the price which she theoretically paid for the assets and which would be treated as coming into the estate as cash on a sale to her, and the total liability of the decedent as against these personal assets at the time of his death. The accountant claims that certain deductions should be made from this inventory value of the personalty to determine the dividends of the creditors. Some of these deductions we agree to as correct, and others we cannot allow. We cannot allow the claim for credit for bad debts out of the accounts receivable, because theoretically she bought all the assets at the appraised value and therefore must stand by her bargain. We cannot allow the claimed deduction of $3,500, in regard to the deposit of that amount in The Merion Title & Trust Company, which she claims can only be used as a set-off, for the obvious reason that she obtained the benefit of the set-off, thereby reducing the claim of The Merion Title & Trust Company, one of the creditors, pro tanto. The appraised value of the building and loan stock, however, which was collateral for a real estate loan should be deducted. The administration expenses are properly deductible. We cannot agree that the bonds accompanying the various mortgages on the real estate in the respective amounts of $9,000, $8,000, and $17,500, can be regarded as proper claims against this fund, as these

claimants did not present the bonds against this distribution and have unequivocally indicated their intention of looking to the real estate as their security. . . .

The account, as modified by this adjudication, is confirmed; and it is ordered and decreed that Marie M. Barclay, administratrix as aforesaid, do pay the distributions herein awarded.

And now, February 21, 1934, this adjudication is confirmed nisi.

From Aaron S. Swartz, Jr., Norristown, Pa.